ABRAHAM W. KLEIMAN, Appellant, v. LOUIS FELDSTEIN, Respondent.

First Department, January 15, 1932.

*Irving Schneider* of counsel [*Engel Brothers*, attorneys], for the appellant.

*Frank M. Wilcox* of counsel [*Bernard J. Vincent*, attorney], for the respondent.

MERRELL, J. The action was brought to recover for personal injuries which plaintiff alleges he sustained by reason of the negligence of defendant. At the opening of the trial the parties stipulated in open court that the action being a non-jury case, findings of fact and conclusions of law be waived, and that each party is deemed to have moved for the direction of a verdict in his favor, and that a verdict might be directed by the court with the same force and effect as though a jury was present. At the close of the evidence the trial justice " on the law and facts " directed a verdict for defendant. Upon such directed verdict the judgment appealed from was entered. Counsel for plaintiff moved to set aside the

verdict and the same was denied, and plaintiff has appealed from the order denying said motion.

Plaintiff, engaged in the business of selling jewelry and diamonds on installments, on April 18, 1929, fell down a stairway in the carpet and rug store of the defendant at about ten o'clock in the forenoon. Plaintiff, accompanied by his wife, had left their home in Brooklyn in an automobile, had been joined by a Mrs. Harris, and proceeded to the defendant's store, where Mrs. Harris desired to purchase a summer rug. Defendant's store contained a single show window in front, which was used for displaying rugs and carpets, the entire window, according to the evidence, being covered by hanging rugs and carpets on display therein. When plaintiff and his lady companions reached the defendant's store on the morning in question they were greeted by the defendant on entering the store, and on being asked their business, plaintiff informed defendant that Mrs. Harris desired to purchase a rug. Defendant then took the party to the rear of his store where he had his rugs on display on a raised platform something over nine by twelve feet in dimension and about a foot or a foot and half above the surface of the floor. Plaintiff, his wife and Mrs. Harris all testify that the store was dark, with practically no outside light; that when the party reached the rug platform in the rear of the store, the defendant turned on an electric light which threw a light to the center of the platform on which there was a pile of rugs. The three witnesses all testify that around the edge of the platform it was dark, but that the electric light sufficiently lighted the platform to see the designs and colorings of the rugs. Plaintiff's wife testified that after defendant had turned back four or five of the top rugs on the platform, they came to a rug in which Mrs. Harris was interested, and that Mrs. Harris then asked the defendant to turn the top rugs, which had been turned back, still further back, so that she could see the design of the rug which pleased her. Plaintiff's wife testified that after Mrs. Harris had asked defendant to unroll the rugs a little more, the defendant said to plaintiff: "Mr. Kleiman, if you don't mind, will you please walk over on the other side and help me unroll the rugs a little bit more so that the customer shall be able to see the definite design?" Mrs. Kleiman then testified that her husband, plaintiff, walked over on the other side and stepped up on the platform, and that as he stepped on the platform and as soon as he took the next step he disappeared with a scream and fell down an open cellarway near the corner of the platform. Plaintiff's wife testified that she ran to the foot of the stairs where her husband had been precipitated and found him unconscious, and that defendant came down and that both of them tried to

raise plaintiff, but were unable to do so; that defendant then obtained the help of a man and with such assistance plaintiff was lifted from the cellar and placed in a chair where he partially regained consciousness; that defendant then procured a physician who gave plaintiff first aid. Plaintiff's wife testified that after defendant came back from calling the doctor, she asked him: " Mr. Feldstein, how in the world can you keep such a dangerous place like this without any protection? Why, anybody can get killed," and that the defendant answered: " I really was down the cellar a little while before you came in, a customer called me out and when I got through with the customer so you people came in and I forgot to close it," and that he further said, " Here, I will show you, I have got a gate and a key," and that defendant showed plaintiff's wife a " long stick, an iron stick," and said, " I have got this," and said, " I forgot to close it." Plaintiff received serious injuries which the evidence shows confined him and kept him from his business as a traveling salesman for three or four months, after which he was able to get about with a cane. He claimed to be suffering, even at the time of the trial, which occurred three years after the accident. As to whether plaintiff would ever completely recover the evidence leaves us in some uncertainty, the surgeon who treated plaintiff stating that in his opinion the plaintiff would be compelled to submit to an operation which might afford him relief.

Plaintiff, sworn as a witness in his own behalf, swore in the same vein as had his wife. He testified that after Mrs. Harris had selected a rug that she liked and asked the defendant to turn back the superimposed rugs further so she could better see the design, the defendant asked him to step over and assist him in turning back the rugs. Plaintiff testified that at that time he was standing on the floor, and he put one foot on the platform and then raised his other foot, and that as he took the first step he was precipitated into space and knew nothing further until he regained consciousness when seated in the chair after being brought from the cellar. Plaintiff agreed with his wife that the platform was dark with the exception of the middle of it where the electric light shone. Plaintiff testified that he was unable to walk around the platform, as there were rugs and linoleum piled against the wall, so he had to step upon the platform in order to comply with the defendant's request for assistance. Defendant admitted the presence of the rolls of rugs and carpets against the wall beside the platform as shown in the photographs.

Mrs. Harris fully corroborated the plaintiff and his wife in their testimony.

The defendant stoutly denied that he himself made any request of plaintiff to assist him in moving the rugs. Defendant was positive that he needed no assistance, but the defendant said that Mrs. Harris, his customer, asked plaintiff to help roll up the rugs, and that plaintiff did help him to some extent. The defendant admitted that he had a gate across the open cellarway which he insisted was always kept closed. He professed that the gate was closed on the morning in question, and he himself had not opened it, and insisted that the plaintiff himself had opened the gate. The testimony of the defendant was very unsatisfactory, and in our opinion he was not telling the truth, and in all probability the testimony of the plaintiff's wife that the defendant stated that he had left the gate open a short time before after going into the cellar with another customer was true. All doubt with reference thereto is, in our minds, dispelled by the testimony of the defendant himself. The defendant was asked on cross-examination: " Q. Did you have that iron gate that is drawn across — A. Yes. Q. The entrance to the cellar? A. Yes. Q. Did you have that iron gate there in April, 1929? A. Yes, all the time. Q. And that iron gate you always — A. At that time — Q. Just a minute please. That iron gate you had there for the purpose of preventing anyone from falling through? A. Yes. * * * Q. What was it there for? A. What — there was the gate, yes. Q. What was the gate for? A. To protect — nobody shouldn't fall through. Q. Fall through the cellar, sure. Was that gate open or closed on the morning of April 18, 1929? A. That gate was open — Q. Just answer my question. A. Yes, that gate was always closed — Q. Just a minute. That gate was always closed? A. Always closed. Q. Was that gate closed on April 18, 1929? A. That was always closed. Q. And was it closed when Mr. Kleiman fell down this basement? A. Yes — no — Q. Just a minute, you have answered the question. Did you go down and pick Kleiman up from the basement? A. Because that time — Q. Just answer my question. A. Yes. Q. Did Mrs. Kleiman go down? A. Yes. Q. Now, I ask you to look at the basement, the staircase where this gate is on Defendant's Exhibit A (handing photograph to the witness). Is that the staircase that you went down with Mrs. Kleiman to pick up Mr. Kleiman? A. No, that was open at that time. The gate was open at that time. * * * Q. Mr. Feldstein, you said a moment ago that the gate was always closed, is that right? Did you say that? A. Sure. Q. Is that true? A. Yes. Q. Do you say now that this gate was closed on April 18, 1929, when the accident happened? A. It was closed. There was a little gate and it was always closed. That day was closed too. He went over

and after was open the gate. \* \* \* The Witness: I said when he went on the other side it was closed. Q. Mr. Feldstein, I am not talking about any other side. I am talking about this side right here (indicating). Will you please confine your answers to this side. Was that gate open when Mr. Kleiman fell down the stairs? A. Well, I am telling you that when he went the other side it was closed the gate and after was open. \* \* \* Q. Who opened the gate? A. That was — not me. He opened the gate. He went over and opened the gate. Q. Kleiman went over and opened the gate? A. Yes, because there was a gate — Q. Kleiman opened the gate? A. There was a little gate, you know. Q. Kleiman opened that gate? A. I didn't open it because — \* \* \* Q. Did Kleiman open it? A. Yes. Q. Kleiman opened the gate? Did you see him open the gate? A. He opened the gate because that gate was always closed. \* \* \* Q. Did you see him open that gate? A. I can't tell you because I know that that gate was — that time was closed the gate. \* \* \* The Witness: When he went there the other side so I was on this side you know, on the other side; so I was on the other side. The Court: Did you see him open the gate? The Witness: I didn't see him but I know the gate was closed. Q. When Kleiman was down the basement the gate was open, wasn't it? A. That time was open, sure. Q. Who opened the gate? You don't know, do you? Do you or don't you? A. He opened the gate, yes." The above quoted testimony shows what little basis the defendant had for his contention that the gate was opened by plaintiff or someone other than the defendant. There certainly was no reason why plaintiff should open this gate. The testimony of defendant on this subject was unbelievable and clearly against the weight of the evidence. We believe the probabilities are all with the plaintiff. The defendant admitted that the gate was there for the purpose of preventing people from falling down the cellarway. The photographs very clearly show the location of this gate, Exhibit A showing the gate closed; Exhibits B and C showing the gate open. The defendant was forced to admit on cross-examination that when the plaintiff went down the cellarway the gate must have been open.

In our opinion the evidence did not justify the justice presiding at the trial in directing a verdict in favor of defendant. We think the plaintiff made out, by a fair preponderance of evidence, a cause of action against defendant, and that the evidence showed that the defendant was negligent in not protecting an invitee in his store from the pitfall existing in this unguarded stairway. The evidence indicates that the light was so dim that plaintiff could not see the open stairway on the morning in question.

In our opinion the directed verdict, so contrary to the weight of the evidence, should be set aside, and the judgment and order appealed from should be reversed, and a new trial ordered, with costs to appellant to abide event, upon the ground that the verdict, as directed by the trial court, was contrary to and against the clear weight of the evidence.

FINCH, P. J., O'MALLEY, SHERMAN and TOWNLEY, JJ., concur.

Judgment and order reversed and a new trial ordered, with costs to the appellant to abide the event.